## CROOKS *v.* CROOKS.

1. DIVORCE—DIVISION OF PROPERTY—RECORD ON APPEAL.

   The record on appeal in a suit for divorce should affirmatively and clearly disclose that a different adjustment of property rights should have been made in order to justify the Supreme Court in disturbing a trial court's judgment as to what disposition should be made.

2. SAME—DIVISION OF PROPERTY—RECORD.

   Record in suit for divorce wherein decree was granted wife terminating 3-year, childless marriage, wherein husband was awarded $300 and a cemetery lot he had owned before the marriage and equities in various pieces of realty to wife, on which down payments had been made largely, when not entirely, from her previously-acquired funds is not disturbed under record presented.

REFERENCES FOR POINTS IN HEADNOTES
[1] 26 Am Jur, Husband and Wife § 116 *et seq.*
[1, 2] 2 Am Jur, Appeal and Error § 119.
[3] 14 Am Jur, Costs § 92.

3. SAME—COSTS—BRIEF.

No costs are awarded on husband's appeal from decree of divorce to wife upon affirmance of the decree, where she filed no brief.

Appeal from Genesee; Elliott (Philip), J. Submitted April 5, 1956. (Docket No. 34, Calendar No. 46,741.) Decided May 14, 1956.

Bill by Loren D. Crooks against Dorothy J. Crooks for divorce. Decree for defendant on her cross bill. Plaintiff appeals only as to division of property. Affirmed.

*Walter J. Barkey,* for plaintiff.

BLACK, J. This appeal, from a decree of divorce entered in the Genesee circuit August 29, 1955, brings us no question excepting that of alleged inequitable and unfair property settlement. The marriage endured but 3 years. No children are involved.

A formal opinion of the chancellor was not prepared or issued. The record, having been made during routine hearing of a property contest without apparent prospect of review, does not materially assist appellate appraisal of the respective equities as claimed. We have no brief for defendant and plaintiff's brief limits argument to 1 paragraph, quoted as follows:

"Division of property in a divorce action depends on many equitable factors. It is certainly true that since the appellant had nothing to do with the accumulation of property which the appellee had at the time of the marriage he should not share at all in this property which amounts to $7,145.25. On the other hand the appellant's 3-year contribution of approximately $95 per week or $18,000 was the main factor in jumping this figure up to $15,742.41 plus household goods and furniture so we can say that

the appellant certainly contributed, as it appears from the evidence, to the acquisition and accumulation of this increase. We believe that the trial court clearly abused its discretion in giving $300 in cash and a cemetery lot appellant owned before this marriage."

. We gather, from the record, the following detail respecting the involved real estate and personal property:

### 1. The Judd road property

This dwelling property was purchased on land contract by Mrs. Crooks prior to the marriage. Her investment therein at time of marriage was $2,000. The parties lived there until purchase of the Wisner street property, hereinafter mentioned. After the marriage Mrs. Crooks purchased an outstanding equity therein (presumably held by an original and prior vendee). This addition to her investment in the property was accomplished with her own funds amounting, as best we can gather from the record, to $319.01.

After the parties moved from Judd road to the Wisner street property Mrs. Crooks sold the Judd road property for $8,750. A $1,500 down payment was made by the purchaser. The contract balance owing to Mrs. Crooks at time of decree was $7,163.32.

### 2. The Paddington street property

This dwelling was purchased outright by Mrs. Crooks, during the marriage, for $2,600 cash. The $2,600 was advanced solely out of her separate funds acquired prior to marriage. She sold the property for $5,850, prior to decree below, by executory land contract. The received down payment was $850 and the contract balance as of date of decree was $4,485.57.

### 3. *The Penoyer court property*

This dwelling was purchased during the marriage for $5,500. $2,500 was paid down and a purchase-money mortgage for the remainder was executed. The deed (and again the record is not clear on this point) apparently named Mr. and Mrs. Crooks as grantees. The $2,500 down payment consisted of $2,000 advanced by Mrs. Crooks out of her own funds acquired prior to marriage plus approximately $375 realized from sale of Mr. Crooks' war bonds. The record gives no help with respect to origin of the remaining $125 that made up the down payment.

This Penoyer court property remained to date of decree in the names of Mr. and Mrs. Crooks. At the time of decree the outstanding mortgage balance was $2,385.53.

### 4. *The Wisner street property*

This dwelling was purchased during the marriage, by executory land contract naming Mr. and Mrs. Crooks as vendees, for $10,000. $1,500 was paid down. The contract prior to date of decree remained in the names of Mr. and Mrs. Crooks as vendees. The outstanding contract balance, as of date of decree, was $8,150.

The $1,500 down payment was derived as follows: $1,000 thereof came from the proceeds of sale of the Paddington street property and approximately $375 thereof was realized from sale of Mr. Crooks' war bonds (another $100 of the down payment came from proceeds of a fire insurance claim apparently belonging to Mr. and Mrs. Crooks).

### 5. *The TV and the deep-freeze units*

The television set was purchased in 1953 for $495 and the deep freeze was purchased about the same

time. The record does not advise with respect to purchase price of the deep-freeze unit and it indicates only that Mrs. Crooks paid an outstanding balance thereon amounting to $112 using her own funds. As to the television set Mrs. Crooks testified that she paid for it entirely out of her own funds. Her testimony in such regard is not disputed.

### 6. *Household furniture, et cetera*

The record shows that all household furniture and equipment, not mentioned above, was purchased prior to the marriage by Mrs. Crooks. The estimated value thereof, as of date of decree, is shown in the record at the sum of $700.

### 7. *The cemetery lot*

This lot was purchased by Mr. Crooks prior to marriage for $330, apparently by means of a small down payment. The balance was paid during the marriage partly from Mrs. Crooks' own funds and partly from Mr. Crooks' wages. The estimated value of the lot, as of date of decree, is given in the record at $400.

It does appear, as claimed by Mr. Crooks, that the net worth of the mentioned real property equities increased substantially during the marital relationship. Whether his earnings contributed materially in such regard became in essence a question of fact. As we shall see, that question was resolved against him. Judge Elliott said:

"He supported her for 3 years. She had to use some of the income and I think it was proper for her and she should be credited with the income that she used for their living, what was used for their living. From these rents of the property they were able to have a television and a new icebox and those kind of things, 2 sticks of lipstick during the 3 years that

probably she could not have had if she did not have this income. I don't see where he has any real claim to this property. * * * All the down payments in every case came from her money. * * * I think she purchased these homes and he made the payments on some of them and some of them she paid from rent money that she got from other premises and at no time have the payments that he made been equal to what he would have paid for rent for the property they were living in. * * * I think that she ought to get the increase in the property values rather than he. It was really her property. That is the way I look at it. * * * They lived up to his pay check of $90 and in addition to that she worked at baby sitting and she had income coming in from her property and they lived that up. They made some investments but I don't think anything that he put in was an investment. He went through bankruptcy twice before he married her, no, once before he married her and 3 months after he married her— he had not saved up anything, and then he admits that she was a good manager, she was a business woman. * * * I think I ought to grant a decree of divorce. I think I ought to give the cemetery lots to him and any of his personal property and I think I should give him $300 for the redecoration work that he has done on the various houses. That is all."

The decree below, entered on Mrs. Crooks' cross bill, follows this final statement of view by the chancellor and it awards the Judd road, Paddington, Penoyer and Wisner equities to Mrs. Crooks outright. No provision for support of defendant by plaintiff was asked or made.

We must in all cases cognizable by equity, and this is peculiarly true in divorce and child custody cases, rely to great extent and as a matter of necessary judicial faith on our trial judges for righteous ascertainment of facts and humane application of equity's conscience. An especially heavy responsibility rests

on them.   In such domestic relations cases, and be-
cause of the chancellor's comparatively better
position of on-the-scene judgment, the record
brought here should affirmatively and clearly dis-
close that a different adjustment of property rights,
or a variant determination of presented issues that
affect personal welfare, is in order before we under-
take a new decree.   Such an affirmative disclosure is
wanting here.

We are unable to say on this limited and uncertain
record that the chancellor's ruling as quoted and de-
cree thereon is contrary to the marital rights of the
husband or that the disclosed fruits of the wife's
investments should not go exclusively to her.   We
therefore affirm.

No costs.

SHARPE, SMITH, BOYLES, KELLY, and CARR, JJ., con-
curred with BLACK, J.

DETHMERS, C. J., concurred in the result.

The late Justice REID did not sit.